Filed 11/30/20  E.W. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| E.W.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF MERCED COUNTY,<br><br>    Respondent;<br><br>MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | F081747<br><br>(Super. Ct. No. 19JP-00049-A)<br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Donald J. Proietti, Judge.

E.W., pro. per., for Petitioner.

No appearance for Respondent.

Forrest W. Hansen, County Counsel, and Maile C. Dunlap, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Smith, Acting P.J., Snauffer, J. and DeSantos, J.

Petitioner E.W. (father), in propria persona, seeks extraordinary writ review (Cal. Rules of Court, rule 8.452) of the juvenile court's orders terminating his reunification services at a 12-month review hearing (Welf. & Inst. Code, § 366.21, subd. (f)(1))[1] in September 2020 and setting a section 366.26 hearing on January 6, 2021, as to his now seven-year-old son by the same name (E.W.). Father contends the juvenile court failed to consider the restrictions imposed by COVID-19 in finding he was provided reasonable reunification services by the Merced County Human Services Agency (agency). Therefore, its findings and orders are error. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

Dependency proceedings were initiated in April 2019 after E.W.'s former foster mother, S.R., petitioned for probate guardianship of then five-year-old E.W. In her moving papers, she alleged father had a problem with alcohol and drugs and was homeless and unemployed. The probate court asked the agency to investigate.

On April 12, 2019, an agency social worker went to the home of Robert G. and Margie G., the paternal grandparents, where father and E.W. resided. Several days before her visit, the agency received a report that Robert struck E.W. and his half sibling. Margie said father was no longer living in her home, explaining he was an alcoholic and damaged their property. She suspected he was also using drugs. Robert said father slept all day while living with them and came home drunk. Margie said father was verbally abusive to E.W., referring to E.W. as " 'bit** and f*****,' " and hit and pushed him. Margie denied E.W. was physically abused but said he did not follow the house rules and his behavior was challenging. She and Robert were not physically and financially able to care for him.

Father did not want to address the allegations in a telephone conversation with the social worker. Although he was difficult to understand and his speech was slurred, he

---

**1** Statutory references are to the Welfare and Institutions Code.

denied being under the influence of drugs or alcohol. He was not able to provide an address where he was residing or make arrangements for E.W.'s care. According to a court order, he had sole legal and physical custody of E.W.

E.W.'s mother said father had custody of E.W. because he " 'won the case.' " E.W. was removed from her in 2014 and father was granted sole custody after she failed to reunify. Father recently informed her he had been kicked out of his parents' home and she may be able to take custody of E.W. Although she was more than willing to care for E.W., she was not employed and did not have the financial means to support him.

E.W. did not want to return to Margie's home because she was " 'mean' " and spanked him on the face with a belt. He wanted to live with his " 'babysitter forever.' " Father drank beer and alcohol " 'every day' " and broke things like a lamp, the front door and the bedroom door. Father fought with E.W.'s sister, Christina, and they punched and kicked each other. He remembered father pointing a knife at him, which father denied. Father said he used the knife as a " 'scaring tactic' " to show E.W. what a " 'bad guy looks like.' " E.W. had not seen his mother.

The social worker took E.W. into protective custody and placed him with S.R. The agency filed a dependency petition seeking his removal under section 300.

The parents appeared at the detention hearing and denied the allegations in the petition but submitted the matter for detention. The juvenile court found prima facie evidence to detain E.W.

In May 2019, a social worker interviewed father by telephone. He said he was in San Jose and on his way to work. The social worker reported difficulty following his thought process and conversation. His speech was rapid, he had difficulty focusing on the topic and he expressed a flight of ideas. He denied any criminal history. He drank alcohol and smoked marijuana but denied abusing substances. He claimed people exaggerated his alcohol consumption and he smoked marijuana to relieve pain caused by arthritis, nerve damage and sciatica. Twelve years before, he was diagnosed with adult

3.

attention deficit hyperactivity disorder (ADHD) and prescribed medication. He received disability for ADHD, posttraumatic stress disorder (PTSD) and a learning disability and had been treated by three or four psychiatrists. He lost his disability status, however, after failing to provide proof.

The agency recommended the juvenile court sustain the petition and offer father reunification services to treat his substance abuse, mental health issues and instability but deny mother services because of her untreated substance abuse and mental illness. (§ 361.5, subd. (b)(10) & (11).)

In July 2019, the juvenile court convened a contested jurisdictional/dispositional hearing. Mother requested the hearing but did not appear and the court denied her attorney's request to continue it. The court sustained the petition and adopted the agency's recommendations regarding reunification services.

Father's services plan required him to demonstrate sobriety, provide E.W. a safe and secure home and stabilize his ADHD and PTSD symptoms. Specifically, he was required to participate in mental health counseling, complete a drug and alcohol assessment and participate in random substance abuse testing.

At the six-month review hearing, father was homeless and staying with friends in Merced. He was employed part time at a liquor store and as security for an event planning company. He completed a drug and alcohol assessment in October 2019 and did not meet the criteria for treatment. He failed to test several times and tested positive for methamphetamine and amphetamine in July and amphetamine in October 2019. He attributed the positive test results to medication he was taking, which was prescribed in March 2018. The agency asked him to provide a current prescription, which he had not done. Father did not complete a mental health assessment and missed seven visits with E.W., which was upsetting for E.W. However, when father did visit, he was encouraging and attentive. Father was hoping to get a better paying job so he could get a home for himself and E.W. E.W. said he missed father and wanted to go home.

4.

The juvenile court continued reunification services for father at the six-month review hearing in December 2019.

The agency recommended the juvenile court terminate reunification services at the 12-month review hearing. Father reported in March 2020 he was still homeless, renting rooms when he could. He had not been able to work since everything shut down for COVID-19. He was inconsistent with visiting and calling E.W. On March 12, 2020, during a meeting with the social worker, he agreed to one monthly in-person visit and weekly video chat visits. However, on March 18, he was notified that all face-to-face contact was suspended due to COVID-19. He was encouraged to increase contact with E.W. by telephone or video chat. However, he did not have any contact with E.W. until June 2020. He also failed to test on several occasions in January and February 2020 and was not participating in mental health counseling. He explained he no longer had Medi-Cal and was unable to get a new prescription. The social worker gave him a telephone number and information to apply for Medi-Cal online. Father said he was not having any major issues with PTSD or ADHD and was using marijuana to treat his mental and physical health. He said he wanted E.W. in his custody but was struggling to find a home and work while reunifying. He was considering giving custody to S.R.

Father requested a contested 12-month review hearing, which the juvenile court conducted on September 15, 2020. Father testified he was living in a sober living home in Merced and working. He obtained health insurance three months before, was attending Alcoholics Anonymous (AA) meetings and had been seeing a psychiatrist for approximately a month. He missed drug tests in January and February 2020 because he was traveling between Merced and San Jose and was homeless. He tested as soon as he established an address and the social worker was able to locate a testing facility near him. On March 8, he tested positive for marijuana and failed to test on March 26. He did not submit to hair follicle testing in Merced County on March 26 because he was in San Jose working and "San Jose only did urine." He moved back to Merced in May. Since

March 26, he submitted to two hair follicle and urine tests. He did not know the test results and denied using drugs. He was unable to obtain mental health treatment sooner because he was homeless and trying to find employment. He found three jobs in San Jose but was only working at one of them because of COVID-19. Additionally, he did not have insurance for mental health services. Even after he obtained health insurance, there was a delay in scheduling an appointment. Visits were going "great." However, during a recent visit, E.W. was "depressed" and "sad." He cried and did not want to play. He kept asking father to "hurry up and get a place." Father stayed involved with E.W.'s activities and only missed visits because of work conflicts or issues related to S.R.

On cross-examination, father testified he had been taking medication for 12 years. He was unable to get a doctor to give him a prescription in February 2020 because there were changes in psychiatric staffing. Father started drinking alcohol when he was 12 and considered himself an alcoholic. Any missed tests were because he was out of town trying to find work not because he was under the influence. The social worker was unable to reach him in February 2020 because he lost his phone. He recalled the social worker attempting to set up an in-person visit with him in mid-June and telling her he was having phone problems. He did not recall drinking and calling E.W. during the Fourth of July weekend and telling him the social worker was "messed up" and responsible for E.W.'s inability to return to his custody. He told E.W. that it was not his (father's) fault, the social worker made reports that she gave to the court. Asked whether he remembered rescheduling a visit in July at the park, he said he remembered rescheduling a visit. He did not remember it was in July. The social worker attempted instead to arrange a telephone call, but father did not answer the phone. He explained he was working moving furniture and trying to keep his phone charged. He regretted missing the call and tried to call back 10 minutes later but no one answered. He did not remember a phone call on August 10 that had to be ended because he was using foul language or calling on August 18 to cancel a visit and using foul language with the social

worker. He admitted calling E.W. after having a few drinks but denied yelling at E.W. during a conversation in late August.

Social worker Heather Rosa testified there were no documented video chats or telephone calls between father and E.W. during the month of April 2020. His first telephone call occurred on May 30. She confirmed the reports that father sounded drunk, used foul language and yelled during telephone conversations. After the conversation on August 26, E.W. commented to the social worker that father sounded drunk.

County counsel argued for the termination of father's reunification services. He received 17 months of services but had not changed. His alcohol abuse continued, and he minimized and excused his behavior. He did not maintain regular contact with E.W. and only recently engaged in mental health treatment. There was not a substantial probability E.W. could be returned to father's custody within the next month if the court continued services. Minor's attorney joined in the recommendation of county counsel. Father's attorney argued father had made changes. He was residing in a sober-living environment, attending AA meetings and receiving psychiatric treatment. He accomplished these changes while struggling to find housing and maintain employment, which she argued demonstrated his commitment to E.W. She argued there was a substantial probability he would be in a better position to reunify with E.W. even within a month.

The juvenile court found it would be detrimental to return E.W. to father's custody, the department provided him reasonable reunification services but he failed to participate regularly and make substantive progress and there was not a substantial probability he could be safely returned to father's custody by the 18-month review hearing. The court addressed COVID-19, stating:

> "… I was looking through [father's] statements and testimony, … whether or not there have been significant changes that would be worthy of continuing services, even for a short period of time, on the prospect that reunification could occur. [¶] And, frankly, over the last 17 months, the only real change is this recent development where [father] has located

7.

housing in a sober-living group.  [¶]  I'm not convinced he is going to AA on a regular basis.  By his own testimony, it was a bit unclear and convoluted, but he did say that it's part of the program but that they weren't actually doing it or encouraged not to do it during the COVID-19.

" … [Father] was very quick to offer throughout his testimony many excuses, including COVID-19.  But that doesn't answer all of the concerns that were raised, including all of the requests to test for alcohol or drugs that were either refused, denied, or just not responded to.  Did not answer the periods of time where there was no visitation or even contact of a telephone nature over a significant period of time between mid-March until May the 30th.

"It doesn't answer the opportunities that were given to him to have in-person contacts in June and July.  It doesn't answer the concerns about his conduct in talking to his son, who is of an age that can't possibly understand at age seven all of the concerns that exist, other than his father wanting to reunify with him.

"But to disparage the social worker, to tell his son that whatever somebody else puts in a report nobody else is going to believe him, to create that kind of anxiety and concern and worry about what's in the child's best interests, is simply a situation where [father], himself, is expressing his lack of commitment, his lack of belief that he can truly change.

"I'm glad he's getting psychiatric help, but it just started.  And so he's at the very beginning again of something that it sounds like he desperately needs.  [¶] … [¶]

"I do understand [father] trying to work, trying to get back on his feet, trying to get insurance, which he did get in May, but didn't actually get the mental health care and medication for a few more months, even though he apparently had the Medi-Cal insurance to do so as early as May."

This petition ensued.

## DISCUSSION

Father contends "COVID[-]19 interfered with my ability to participate in the ordered services, but the court declined to consider the impact the pandemic had[.]"  The record does not support his claim.

8.

At the 12-month review hearing, if the child is not returned to his or her parent's custody, the juvenile court must determine whether the services offered were designed to aid the parent in overcoming the problems that led to the initial removal of the child. (§ 366.21, subd. (f)(1)(A).)  There is no one-size fits all solution.  "[T]he record should show [the department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  "The court shall not order that a hearing pursuant to [s]ection 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian."  (§ 366.21, subd. (g)(1)(C)(ii).)

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence."  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "[A]n appellate court must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  We conclude substantial evidence supports the court's finding.

Notably, father does not fault the department for failing to help him access services.  He simply claims the limitations imposed by the statewide shutdown caused by

9.

the pandemic prevented him from participating in services. However, as the juvenile court explained, the evidence does not bear that out. E.W. was removed from father's custody because he was struggling with alcohol addiction. After nearly a year and a half of services, very little had changed. He was still drinking to inebriation, as evidenced by his slurred speech during telephone conversations, and was doing little to nothing to help himself. He testified he was attending AA meetings, but the court did not find him credible, and he was not testing for drugs and alcohol. His excuse, however, was not that COVID-19 prevented him from testing but that he was unsettled and moving between Merced and San Jose. Father also always had the ability despite COVID-19 to maintain contact with his son but did not take the opportunity. He could have, for example, increased telephone contact when he could not have in-person visitation but did not. Nor did he take full advantage of in-person visitation when it became available again. There is simply no support for father's contention COVID-19 prevented him from meaningfully participating in his reunification services.

We conclude the juvenile court properly found father was provided reasonable reunification services and affirm its orders terminating services and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.